James Watson,                               )
                                            )
        Plaintiff,                  )
                                            )
        v.                          )      No. 15 C 11559
                                            )
Antonio Fulton, Keion Feazell,              )      Judge Edmond E. Chang
Leo Jefferson, Jeffery Smith,               )
Anthony Smith, City of Chicago, and         )
AutoZone, Inc.,                             )
                                            )
        Defendants.                 )

## MEMORANDUM OPINION AND ORDER

James Watson has sued several Chicago police officers, as well as the City of Chicago, auto-parts company AutoZone, and an AutoZone employee for injuries that Watson alleges were caused in an altercation about a car battery. R. 41, Am. Compl.[1] After discovery, the Defendants filed a motion for summary judgment on the following claims: the federal claims for excessive force (Count 1), conspiracy (Count 2), and failure to intervene (Count 3);[2] and the Illinois common law claims for assault and battery (Count 5), intentional infliction of emotional distress (Count 6), negligent infliction of emotional distress (Count 7), and *respondeat superior* (Count 8). R. 154, Defs.' Mot. Summ. J; *see also* Am. Compl. For the reasons explained below, the motion is granted in part and denied in part.

---

[1]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number. The Court has federal question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a).

[2]Because Watson withdrew his claim for conspiracy in his response brief, R. 163, the Court will not address it.

# I. Background

In deciding the Defendant's motion for summary judgment, the Court views the evidence in the light most favorable to the Plaintiff. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The facts narrated here are undisputed unless otherwise noted.

In January 2015, James Watson brought a car battery into an AutoZone store for charging, and was told to return in about an hour to pick it up. R. 156, DSOF ¶¶ 4-5;[3] R. 156-1, DSOF, Exh. A, Watson Dep. Tr. at 110:1-21, 117:15-19. Later, Watson sent his friend, Jim Garner, to the AutoZone to pick up the battery for him. DSOF ¶ 6; Watson Dep. Tr. at 103:4-8, 123:8-24. AutoZone employees told Garner that the old battery could not be charged and that instead Watson needed to buy a new one. DSOF ¶ 6; Watson Dep. Tr. at 123:8-24. Garner bought a new battery, using in part a credit for the old battery, and brought the new battery back to Watson. DSOF ¶ 7; Watson Dep. Tr. at 123:12-24. Unfortunately, there was something wrong with the new battery, and Watson and Garner had to return to the AutoZone. DSOF ¶¶ 10-11; R. 178, Defs.' Resp. PSOF ¶ 1. The parties disagree about whether the new battery failed to start Watson's car, and about whether Watson hoped to get a refund for the new battery or intended to retrieve the old one. R. 164, Pl.'s Resp. DSOF ¶ 10. Neither fact is all that important for purposes of this motion.

---

[3]Citations to the parties' Local Rule 56.1 Statements of Fact are identified as follows: "DSOF" for the Defendants' Statement of Facts [R. 156], "PSOF" for Watson's Statement of Facts [R. 164], "Pl.'s Resp. DSOF" for Watson's response to the Defendants' Statement of Facts [R. 164], and "Defs.' Resp. PSOF" for the Defendants' response to Watson's Statement of Facts [R. 178].

When Watson and Garner returned to the AutoZone, Watson brought the new battery to a manager at the counter—later identified as Shan Moore, *see, e.g.*, R. 156-2, DSOF, Exh. B, Ayon Dep. Tr. at 144:1-3—who said it would need to be tested. DSOF ¶ 12; Watson Dep. Tr. at 136:14-137:3, 137:16-138:13. While Watson was waiting for the testing (which he did not think he should have to do, DSOF ¶ 13), Garner told Watson that he saw Watson's old battery "five to six feet away." *Id*. ¶ 14; Watson Dep. Tr. at 138:3-8, 140:12-22, 142:21-23, 250:6-252:24. The Defendants allege that "it was just a standard AutoZone battery," without any "unique identifiers." DSOF ¶ 16. Watson maintains that there *were* unique identifiers, specifically "the number 14 … and a green mark." Pl.'s Resp. DSOF ¶ 16; Watson Dep. Tr. at 257:16-258:2. Either way, the Defendants do not dispute that "Watson recognized his old battery." Defs.' Resp. PSOF ¶ 2. Watson then picked up that old battery "from a cart near the AutoZone counter." *Id*.

According to Watson, once he picked up the battery, the AutoZone manager approached him "in an aggressive and imposing way[,]" and stood with "his face only an inch or two from [Watson's] face." R. 164-1, PSOF, Exh. 1, Watson Decl. ¶ 8; *see also* R. 164, PSOF ¶ 3. The Defendants argue that this account "re-characterize[s]" Watson's deposition testimony, yet acknowledge that Watson testified that the manager was "at him." Defs.' Resp. PSOF ¶ 3 (quoting Watson Dep. Tr. at 25:14-26:8). The Defendants also point out that Watson testified that the manager did not touch or say much to him. *Id*.; Watson Dep. Tr. at 255:14-26:8; Pl.'s Resp. DSOF ¶ 17. Watson acknowledges that Watson told the manager, "hit me." Pl.'s Resp. DSOF ¶

17. He testified that he said that because the manager "seemed like he was going to hit [him], the way he came at [him]." Watson Dep. Tr. at 256:9-16.

Watson also interacted with two other AutoZone employees, who allegedly attacked Watson, "stomped on his feet, and yanked on [his] arms so hard that he was yanked around the store." PSOF ¶ 4; Watson Dep. Tr. at 142:5-12 ("They was … yanking me and pulling me around, stomping my feet, yanking my hand, trying to yank the battery out ... Kind of messed up my shoulder and my wrist."). The Defendants dispute that it happened this way, but their objections do not entirely contradict Watson's testimony. *See* Defs.' Resp. PSOF ¶ 4. For example, the Defendants note that Garner testified the two employees were "jostling and bumping" Watson and acting "like they were ready to attack" him. Defs.' Resp. PSOF ¶ 4; R. 164-2, PSOF, Exh. 2, Garner Dep. Tr. at 48:19-49:6. This does not directly contradict Watson's account. Garner also testified that "[t]hey were pointing their fingers and trying to intimidate Mr. Watson and they were bumping up against him while this other guy was trying to jerk the battery out of his hand and whatnot. They were like roughing him up a little bit." Garner Dep. Tr. at 50:22-51:7. During this time, Watson admits that employees were not able to take the battery from him, and that he could "have easily just walked out with it." DSOF ¶ 25; Watson Dep. Tr. at 158:9-24.

At some point, someone in the store called 911. The Defendants' stories about who made the call, and what they told the 911 operator, do not exactly match. Moore, the store manager, testified that he called 911 and told the operator that Watson was making threats toward the AutoZone employees. R. 156-3, DSOF, Exh. C, Moore Dep.

Tr. at 59:8-24. Another employee, Vanessa Frazier, also testified that she called 911, but that she simply told the operator there was a disgruntled customer in the store. R. 156-4, DSOF, Exh. D, Frazier Dep. Tr. at 32:24-33:3. Notably, Frazier testified that Moore did *not* call the police. *Id*. at 47:11-19. Yet another employee, Temprance Parks, testified that other employees, including Frazier, asked *her* to call the police and she did so. R. 156-5, DSOF, Exh. E, Parks Dep. Tr. at 46:4-47:8, 57:3-14. Importantly, Moore is the only employee who testified reporting threats to the 911 operator, *see* Moore Dep. Tr. at 59:8-24, but there is actually no evidence that the Defendant Officers learned anything about a threat from dispatch.

The entire physical interaction with the AutoZone employees lasted about two to five minutes. DSOF ¶ 26; Watson Dep. Tr. at 155:20-156:5. The parties agree that the police officers arrived around five to ten minutes *after* that. DSOF ¶ 30. The parties dispute, however, what was going on in the store when the officers arrived. Officer Antonio Fulton testified that he saw Watson and the manager yelling at each other from a few feet apart before he walked into the store. R. 156-6, DSOF, Exh. F, Fulton Dep. Tr. at 16:2-11. Officer Keion Feazell testified that when the officers walked into the store, he heard Watson "screaming" at the manager. R. 156-7, DSOF, Exh. G, Feazell Dep. Tr. at 41:16-42:12. Meanwhile, Moore's testimony contradicts both officers' accounts: he says that Garner and Watson were near or outside the door to the shop when the officers arrived, and by that time the "ruckus had subsided." Moore Dep. Tr. at 64:3-22. Parks's testimony is slightly different: that there was arguing until the police came in and *then* it got quiet. Parks Dep. Tr. at 61:15-62:15.

In any case, the Defendants admit that "[t]here was no commotion when the police officers came into the AutoZone." DSOF ¶ 33.

It is equally unclear what happened once the police officers entered the store, as well as what they heard while they were there. Officer Fulton testified that he only spoke to store manager Moore, and the story that Fulton reports hearing from him does not include Watson yelling or doing anything threatening. Fulton Dep. Tr. at 19:13-20:20, 21:2-5. Moore agrees that he spoke with Fulton, and his story also lacks any report that he told Fulton about any threats or aggressive behavior by Watson. Moore Dep. Tr. at 67:9-68:3. It is undisputed that Feazell only spoke to Watson, and not to any AutoZone employees. Defs.' Resp. PSOF ¶ 7. Feazell did testify, however, that Watson was screaming when Feazell first walked in the store. Feazell Dep. Tr. at 41:16-24. Further, Parks testified that she and Frazier both talked to the police— though as described above, the officers do not acknowledge speaking to them—but she does not give specifics on what they told the officers. Parks Dep. Tr. at 109:11-20. Meanwhile, Frazier does not report talking to the police at all.

On the other hand, Watson's story is that several employees spoke with the officers, and he also adds a little color: "Once the police came, [the employees were] just trying to make me look like a bad guy. He did this, he did that. He came behind the counter. He took a battery." Watson Dep. Tr. at 174:1-8, 181:1-16, 182:1-11. But note that Watson never reports that the employees told the officers that he had threatened or tried to hurt them. *See id*. The one piece of the conversation the parties

do agree on is that the employees told the officers that Watson "came behind the counter and took a battery." Pl.'s Resp. DSOF ¶ 37.

Watson, for his part, told the officers "that he was attacked by the AutoZone employees." PSOF ¶ 5; Watson Decl. ¶ 12. While the police were questioning the employees, Watson acknowledges that he "made comments when the AutoZone employees said something untrue." PSOF ¶ 6; Watson Dep. Tr. at 182:1-11. There is some disagreement on how loudly or aggressively Watson was speaking. He maintains that he did not yell or speak aggressively, Watson Decl. ¶ 13; Watson Dep. Tr. 6-17, but the Defendants disagree, Defs.' Resp. PSOF ¶ 6. Specifically, the Defendants argue that Watson's declaration mischaracterizes his deposition testimony. *Id.* In the declaration, Watson maintains that "[a]t no time did [he] yell, shout, scream, act belligerent, use profanity, threaten physical violence, or use abusive language," that when he spoke with the officers and employees he "spoke loudly and clearly so [he] could be understood," and that when he contradicted the AutoZone employees to the police "he was not yelling or shouting." Watson Decl. ¶¶ 9, 12-13. The Defendants believe that these statements contradict what they see as admissions from Watson that he was "'talk[ing] hard' in a manner that people may feel threatened by, that he was speaking with authority in his voice, and that he was speaking in a manner that may have come across as aggressive." R. 179, Defs.' Reply Br. at 2 (citing Watson Dep. Tr. at 153:20-155:2); DSOF ¶¶ 35-36. But Watson's deposition does not admit quite so much—especially not if the facts are viewed in the light most favorable to him. Watson did testify he was trying to explain himself "loud

7

and clear" when the police were present. Watson Dep. Tr. at 165:6-20, 167:16-22. But that phrase is often used to denote tone, not necessarily volume. *See id.* at 167:16-22. In response to a direct question, Watson also agreed in his deposition that it was possible that other people in the store *might* have thought he was being aggressive, Watson Dep. Tr. at 168:10-12 ("I think so. Maybe. I think so."), but the transcript makes clear that Watson did not believe he was really behaving in a way that would have justified that belief, *see id.* at 168:13-169:4 (Watson testifying that he "wouldn't know why" others might perceive him as threatening under the circumstances). Ultimately, Watson's declaration—while clearly an attempt to *clarify*—does not *contradict* the deposition testimony in the direct ways the Defendants suggest.

There is also disagreement on whether Watson was interrupting the employees or officers as they spoke, or whether he was just "commenting" at every available opportunity to make his side of the story heard. According to Watson, his "comments did not interrupt the Defendant Officers," and no one "ever had to stop speaking due to a comment" he made. PSOF ¶ 8; Watson Decl. ¶ 13. The Defendants counter that while no one ever told Watson "his comments were impeding their investigation," his actions *did* "impede the [the officers'] investigation and [their] ability to de-escalate the situation." Defs.' Resp. PSOF ¶ 8; *see* DSOF ¶ 39.

After these verbal exchanges, according to Watson, Fulton[4] violently and suddenly moved him out of the store. First, Watson testified, Fulton "told him to shut

---

[4]Neither Watson nor Garner name the officers in their testimony—instead, they differentiate the officers based on their appearance. For example, Watson describes the "first" officer—the one who, according to Watson, asked him what happened and later shoved him out of the store—as a lighter-skinned African-American man, and the "second" or "other"

up, threatened to throw [him] out of the [] store, [and] threatened to body slam [him]." Pl.'s Resp. DSOF ¶ 40 (citing Watson Dep. Tr. at 165:8-166:5). Fulton then tried to push Watson out of the AutoZone. Defs.' Resp. PSOF ¶ 10. Specifically, Fulton "grabbed [his] arm, manhandled [him], and forced [him] to the door." Watson Dep. Tr. at 172:5-11. Watson testified that he did not move at first when Fulton pushed and grabbed him; instead, Watson tried to tell Fulton that he just wanted his refund.[5] *Id.* at 167:3-8, 172:8-10. At this point, according to Watson, Officer Feazell chimed in and threatened that "we're going to body slam you if you don't get out of the store." *Id.* at 167:3-12.

After that, the record is unclear as to who exactly shoved Watson (and how they did so) through the doorway of the AutoZone. Watson testified that both officers threatened to body slam him, but that "[o]ne officer was holding [him], the one that forced [him] out." Watson Dep. Tr. at 172:12-14. According to Watson, Fulton was the one holding his right arm behind his back, and also holding his shoulder. *Id.* at

---

officer as a darker-skinned African-American man. *See* Watson Dep. Tr. at 163:9-16, 166:6-8, 170:2-22. In any event, the parties do not dispute that it was Officer Fulton who asked Watson what happened, Pl.'s Resp. DSOF ¶ 34, and who grabbed Watson's right arm behind his back, *id.* at ¶ 43. Watson's excessive-force claim also explicitly names Officer Fulton. R. 41, Am. Compl. ¶ 34. On the other hand, the identity and involvement of the "second" officer is less clear. The Defendants admit that Officer Feazell also escorted Watson outside the AutoZone store. DSOF ¶ 46. Watson responds that "[i]t is undisputed that *a Defendant Officer* shoved [him] out of the AutoZone[,]" but he does not offer any evidence to contradict that it was *Feazell*. Pl.'s Resp. DSOF ¶ 46 (emphasis added). On these facts, the Court will presume that, in addition to Officer Fulton, the second officer who was nearest to the incident and who potentially participated in the alleged force was Officer Feazell.

[5]The Defendants characterize Watson's initial standing still (instead of moving with the push) as resistance. Defs.' Resp. PSOF ¶ 10. But the deposition testimony they cite for that idea simply reflects that he stood still—not that he actively resisted. Watson Dep. Tr. at 167:3-8 ("[A]t first I didn't let him, you know, push me. I just stand there."); *id.* at 172:5-11 ("I didn't let him.").

172:15-173:3. *But see id.* at 173:11-15 (Watson testifying that after both officers threatened him, Watson "just let go[,]" and then "*they* threw [him] out." (emphasis added)). As Watson was being thrown out, he testified, the "other officer" (presumably, Feazell) opened the door, which then hit Watson in the back as it closed. *Id.* at 195:16-196:7; *see* Watson Decl. ¶ 17. Garner, on the other hand, testified that the officers—Fulton and Feazell—were on either side of Watson and were "holding him and roughly shoving, pushing him as they … were walking him out the door." Garner Dep. Tr. at 64:11-18. He went on to describe that "they both had [Watson's] arms and the other one was – they might have been … grabbing him in the collar or whatever … and they were, you know, threatening him as they were … ejecting him from AutoZone." *Id.* at 65:15-22. He added that "they were manhandling him and they were like lifting him, shoving him, and it was a lot of physical contact from the time they started that until they walked him out, which looks like maybe about ten feet." *Id.* at 68:6-11. Watson believes it took less than a minute for this to happen. Watson Decl. ¶ 16. After Watson was thrown out of the store, he and the officers eventually left separately. Pl.'s Resp. DSOF ¶¶ 48-52.

It is worth noting that the officers' stories of what happened are diametrically opposed to Watson's. According to Feazell, he asked Watson to step out of the store while Fulton was talking to Moore, and Watson complied. Feazell Dep. Tr. at 47:5-48:9, 50:10-23, 64:14-23. Frazier's account tracks this one: she testified that the police asked Watson to step out and he complied. Frazier Dep. Tr. at 38:17-23. But Fulton's story is slightly different: he implies that the officers did not interact with Watson at

all, and that Watson walked out on his own while Fulton was speaking with Moore. Fulton Dep. Tr. 19:11-21:1. By Fulton's account, neither he nor Feazell knew where Watson had gone when they stepped outside to look for him. *Id.* Of course, Watson does not validate this version of the story at all.

About an hour after these interactions, Watson noticed "pain in his feet, arms, and shoulders." PSOF ¶ 16; *see* Watson Dep. Tr. at 180:1-7, 193:3-6. He went to the hospital and received x-rays and was prescribed pain medication. PSOF ¶ 16. Specifically, Watson was treated for "contusion of elbow, foot, neck pain." R. 165-2, PSOF, Exh. 5 at Watson 00085. He was prescribed two types of medication, ibuprofen and cyclobenzaprine HCL, *id.* at Watson 00087, and provided with ambulatory care instructions for the contusions, *id.* at Watson 00075-79. Although the doctor wanted to follow-up on the x-ray results, Watson testified that he did not have insurance at the time, so he never followed up. Watson Dep. Tr. at 197:19-200:10. He did, however, go to another emergency room a little over a week later, where he was again treated for contusions and back pain. PSOF, Exh. 5 at Watson 00090. Watson asserts that he suffered ongoing physical injuries after the incident, including "pain and bruising in his feet, shoulders, neck and elbow." PSOF ¶ 19; *see* Watson Dep. Tr. at 193:1-10, 197:19-200:7.

Watson also reports psychological injuries, including "sleep[ing] 12 to 24 hours a day, suffer[ing] from a lack of motivation and occasional feelings of nothingness, and cr[ying] every day." PSOF ¶ 19; Watson Dep. Tr. 219:20-221:8, 223:15-224:1. He attributes his injuries to the incident. PSOF ¶ 19. Due to these emotional and

physical injuries, Watson was unable to continue some of the activities by which he made a living, including dog walking, car optimization and repair, and baking. *Id.* ¶¶ 17-18; Watson Decl. ¶ 21; Watson Dep. Tr. at 41:21-42:19, 45:1-20, 46:17-49:11, 78:21-79:6, 81:7-83:11. Although Watson still gets paid to take care of his parents, he has been unable to take on new home-services clients. PSOF ¶ 17; Watson Decl. ¶ 19. Unfortunately, Watson did not have medical insurance at the time of the incident, so he was not able to seek help from a psychiatric professional. PSOF ¶ 20; Watson Dep. Tr. at 197:22-198:1. When he did eventually obtain medical insurance, he was diagnosed with depression in 2017 and prescribed medication. PSOF ¶ 21; Watson Dep. Tr. at 222:15-17. *See also* R. 165-1, PSOF, Exh. 4 (Medical Records) at Watson 00306 (medical professional noting that Watson "[h]as been seeing [her] for ongoing depression since attack" in 2015).

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must "view the facts and draw reasonable inferences in the light most favorable to the" non-moving party. *Scott v. Harris*, 550

U.S. 372, 378 (2007) (cleaned up).[6] The Court "may not weigh conflicting evidence or make credibility determinations," *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (cleaned up), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## III. Analysis

### A. Federal Claims

#### 1. Use of Force

Watson's first claim is for excessive force under the Fourth Amendment (note that it is not a claim for an unreasonable *seizure*) against Officer Fulton and "one of the other Participant Officers" (who are defined as Fulton and either Leo Jefferson or Keion Feazall). *See* R. 41, Am. Compl. ¶¶ 2, 33-40. Excessive-force claims are evaluated based on whether the officer's actions were objectively reasonable under the circumstances. *Graham v. Connor*, 490 U.S. 386, 396 (1989). Reasonableness "must be judged from the perspective of a reasonable officer on the scene," and not

---

[6]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

based on hindsight. *Id.* Each case is different: "proper application [of the standard] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).

The Seventh Circuit has long held that "police officers [cannot] use significant force on nonresisting or passively resisting suspects." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 732 (7th Cir. 2013) (cleaned up). Instead, "only a minimal amount of force may be used on such arrestees." *Id.* (cleaned up); *see also Morfin v. City of E. Chicago*, 349 F.3d 989, 1005 (7th Cir. 2003) (jury could find excessive force where plaintiff "did not pose a threat to the officers" and "did not resist arrest in any way"); *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996) ("It is clear … that police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever.").

Here, a reasonable jury could find that the officers who were directly involved in shoving Watson out the door used excessive force. First, though, Watson seems to argue that the officers had no right to use *any* force all. R. 163, Pl.'s Resp. Br. at 6-7. That is not quite right. The record suggests that the officers had probable cause to believe that Watson had committed a theft (or at least, reasonable suspicion to investigate further). Whether it was true or not, even Watson acknowledges that the AutoZone employees *told* the officers that he had gone behind the counter to retrieve a battery. Pl.'s Resp. DSOF ¶ 37; Watson Dep. Tr. at 174:1-8, 181:1-16, 182:1-11. So—

even if Watson told the officer that it was not true—the officers had information on which to premise a probable-cause finding.

That said, it would not have been reasonable for the officers to use "significant" force on a non-resisting or passively resisting subject who did not pose a threat to anyone in the store. *Abbott*, 705 F.3d at 732. Here, the evidence presented by Watson—if the jury believes his account—suggests he was at most passively resisting. Although the Defendants make much of the fact that Watson did not allow Fulton to push him immediately, Defs.' Resp. PSOF ¶ 10, Watson has never admitted to actually responding to or getting in the way of Fulton's attempt to move him. *See id.*; Watson Dep. Tr. at 167:3-8. The Defendants have not offered any evidence of probable cause to believe that Watson posed a threat to anyone during his conversation with the officers and employees, or that the officers walked into the store with any reason to believe he had threatened anyone before they arrived. In fact, the weight of the evidence is that the store was calm when the officers walked in. DSOF ¶ 32.; *see also* Moore Dep. Tr. at 64:3-22. The most that the undisputed facts show is that Watson was frustrated, possibly loud, and making it harder for the officers to understand what was going on. Given that, a jury could find that the force used (again, according to Watson) was not reasonable.

A jury could also find that the force was significant. Watson describes Fulton twisting Watson's arm behind his back and shoving him out the door. Defs.' Resp. PSOF ¶ 12. Garner also testified that the officers—that is, Fulton *and Feazell*—were on either side of Watson, and were roughly shoving him, pushing him, grabbing him,

and lifting him through the front door. Garner Dep. Tr. at 64:11-18, 65:15-22. Taking the facts in the light most favorable to Watson, a jury could reasonably conclude, on the basis of *Garner's* testimony, that *both* Fulton and Feazell perpetrated the alleged force. In fact, the force Watson alleges was so strong that there is a reasonable inference that it caused him shoulder, elbow, and wrist injuries. That is not to say that the officers were not entitled to use *any* force. Instead, given that Watson was not a threat to anyone, had potentially committed only a non-violent crime, and was at most passively resisting, a jury could find that there was no reason for the officers to exert that level of force on him. *See Morfin*, 349 F.3d at 1005 (reversing district court's grant of summary judgment where police officers grabbed plaintiff, twisted his arm, shoved him toward the wall, and took him to the floor, even though plaintiff was not resisting and did not pose a threat). Because a reasonable jury could find that excessive force was used, the Defendants' motion is denied on this claim.[7]

Also, because it is well-established in the Seventh Circuit that officers "cannot use significant force on non[-]resisting or passively resisting suspects," the Defendants' qualified immunity bid must fail as well. *Abbott*, 705 F.3d at 732. It is true that the legal principle as described at that high level of generality is not the

---

[7]Because the Defendants did not argue that Officer Jefferson was not directly involved in the alleged force until their reply brief, *see generally* R. 155, Defs.' Br.; Defs.' Reply Br. at 8, that argument is forfeited. *See United States v. Alhalabi*, 443 F.3d 605, 611 (7th Cir. 2006) (arguments raised for the first time in reply briefs are waived). So, Watson's excessive force claim survives not only against Officers Fulton and Feazell, but also against Officer Jefferson, who was implicated in the complaint as a potential "Participant Officer[,]" Am. Compl. ¶¶ 2, 34. Nevertheless, if there is no evidence that Jefferson was personally involved in the alleged excessive force, Watson should consider voluntarily dismissing him from the entire case (otherwise, there is a risk of a mid-trial Rule 50 judgment as to this Defendant and at least some cost-shifting).

ultimate inquiry: instead, qualified immunity is analyzed based on the specific facts of a case. Here, if the jury believes Watson and Garner's accounts of what happened in the store and what force was used—with no active resistance from Watson at all and no warning on the use of force in these circumstances—then a reasonable officer would know that he had used excessive force in forcing Watson's arm behind his back, shoving him, and lifting him out of the store, all intensely enough to cause long-lasting physical injuries. Those facts amount to a violation of Watson's clearly established right against excessive force.

## 2. Failure to Intervene

Turning to Watson's second federal claim, Watson argues that Officers Feazell, Jefferson, and Smith failed to intervene to prevent the excessive force from happening. Pl.'s Resp. Br. at 8-9. To succeed on this claim, Watson "must demonstrate that the Defendants (1) knew that a constitutional violation was committed; and (2) had a realistic opportunity to prevent it." *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017). The Defendants' primary argument on this claim is that there can be no failure to intervene where there has not been a constitutional violation. R. 155, Defs.' Br. at 8-9. Of course, as described above, a reasonable jury could find a constitutional violation, so that argument fails.

The Defendants' second argument, however, is that if there was a constitutional violation, the officers who were not involved in it did not have any opportunity to intervene. Defs.' Br. at 9; Defs.' Reply Br. at 9. According to Watson, it took less than a minute for Fulton (and perhaps Feazell as well) to move him out

of the store. Watson Decl. ¶ 16. And, as discussed above, Watson's account features Fulton using significant force on him without first asking him to leave the store—in fact, Watson alleges that he was "shocked" by the force, Watson Decl. ¶ 15. Meanwhile, according to Watson, a "third" officer was outside when Watson was thrown out of the store, but there is no evidence as to this officer's identity. Watson Dep. Tr. at 169:11-14. Watson could not even remember a fourth officer. *Id.* at 169:5-10. On this bare record, no reasonable jury could conclude that Jefferson and Smith were even near enough to the incident to see what was happening, let alone that they had any real opportunity to intervene. Summary judgment is granted on this claim as to Smith and Jefferson.[8]

As for Feazell, taking the evidence in the light most favorable to Watson on this claim requires looking at *Watson's* version of the facts—as opposed to Garner's (*compare with supra* Section III(A)(1)). Watson's testimony suggests that Fulton was the only officer perpetrating the alleged force; after the first initial push by Fulton, Feazell only *threatened* to body slam Watson, Watson Dep. Tr. at 167:3-12, and as Watson was being thrown out, Feazell closed the door which then hit Watson in the back, *id.* at 195:16-196:7; Watson Decl. ¶ 17. Even if the incident lasted less than a minute, Watson has raised a genuine issue of fact on whether Feazell had a realistic

---

[8]Although neither party addresses this in their briefs, Watson's complaint also alleged a failure-to-intervene claim against Officer Fulton. *See* Am. Compl. ¶¶ 48-53. Given that the evidence, taken in the light most favorable to Watson, suggests that Fulton was the primary perpetrator of the alleged excessive force, it logically follows that he cannot also be the subject of a failure to intervene claim. Fulton is thus dismissed from Count 3. In contrast, both the excessive force and the failure to intervene claims survive against Feazell, because there is still a genuine issue of material fact as to his involvement in the alleged force.

opportunity to intervene, considering that he was close enough to the alleged force to observe, comment, and even touch the door. On these facts, the failure to intervene claim against Feazell cannot be ruled out.

## B. State Law Claims as to AutoZone Employees

### 1. Intentional Infliction of Emotional Distress

Moving on to the state law claims, Watson alleges that the AutoZone employees committed the tort of intentional infliction of emotional distress when they came very close to him in a threatening manner, yanked and pushed him, and stomped on his feet. Pl.'s Resp. Br. at 10-14. An emotional-distress claim of this type under Illinois law requires that "(1) the defendant's conduct was extreme and outrageous, (2) the defendant either intended that his conduct would inflict severe emotional distress, or knew there was a high probability that his conduct would cause severe emotional distress, and (3) the defendant's conduct in fact caused severe emotional distress." *Zoretic v. Darge*, 832 F.3d 639, 645 (7th Cir. 2016) (cleaned up). The Defendants argue that the claim must fail because the employees' conduct was not "extreme and outrageous," Defs.' Br. at 13-15, there is no evidence that the employees intended to cause emotional distress, *id*. at 15-17, and the emotional distress Watson has claimed is not "severe," *id*. at 17-19.

The Court will consider the first two elements of the tort—"extreme and outrageous" conduct, and the Defendants' intent—together, as courts often do. *See Honaker v. Smith*, 256 F.3d 477, 494 (7th Cir. 2001) ("Courts have generally found [the second element] to be satisfied either when a defendant's actions, by their very

nature, were likely to cause severe distress or when the defendant knew that a plaintiff was particularly susceptible to such distress and that, because of this susceptibility, the defendant's actions were likely to cause it to occur."). "Mere insults, indignities, threats, annoyances, petty oppressions or trivialities are not actionable as intentional infliction of emotional distress." *Zoretic*, 832 F.3d at 645 (cleaned up). Truly extreme and outrageous conduct is "so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized community." *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80-81 (Ill. 2003). Courts take several factors into account when evaluating whether conduct is extreme or outrageous, including (1) the degree of control the defendant has over the plaintiff, (2) the defendant's reasonable belief in the legitimacy of their objective, and (3) the defendant's awareness of the plaintiff's susceptibility to emotional distress. *McGrath v. Fahey*, 533 N.E.2d 806, 810-11 (Ill. 1988).

The Defendants are correct that Watson has failed to establish a dispute of material fact as to these first two elements. Even taking his version of the story as true, there was not "extreme and outrageous" conduct. Essentially, Watson has offered testimony that the AutoZone employees "stomped on his feet, and yanked on [his] arms so hard that he was yanked around the store." Watson Dep. Tr. at 142:5-12; *see also* Garner Dep. Tr. at 48:19-49:6, 50:22-51:7. He also has claimed that the store manager, Moore, approached him in a threatening way. Defs.' Resp. PSOF ¶ 3 (claiming that Moore "came towards Watson as if he was going to attack [him] … in an aggressive and imposing manner, standing an inch or two way from [] Watson's

face."). First off, those actions simply do not rise to the level of extreme and outrageous conduct that Illinois courts have found to be necessary, even taking all of the evidence in Watson's favor. It does not "go beyond all possible bounds of decency [such that it would be] regarded as intolerable in a civilized community." *Feltmeier*, 798 N.E.2d at 80-81. If the Defendants' actions in this case were found to be extreme and outrageous, then *any* battery could then qualify as extreme and outrageous. That cannot be right: the tort of battery is not the same as the tort of intentional infliction of emotional distress.

More specifically, none of the factors identified in *McGrath* could convince a reasonable jury to view the Defendants' actions as extreme and outrageous. It does appear that the AutoZone employees, if they attacked Watson in the way he claims, might have had some reasonable belief in the legitimacy of their objective (if not the legitimacy of their means). From their perspective, Watson was trying to steal a battery they believed belonged to the store. DSOF ¶ 37; Watson Dep. Tr. at 174:1-8, 181:1-16, 182:1-11. Also, there was no relationship between Watson and the employees that made him particularly vulnerable to emotional distress. He was simply a customer and, as he testified, he was not at their mercy—he could have "walked out" at any moment. DSOF ¶ 25; Watson Dep. Tr. at 158:9-24. And the employees certainly had no reason to think Watson was unusually susceptible to emotional distress: he even admits that he told Moore something along the lines of "hit me." Pl.'s Resp. DSOF ¶ 17; Watson Dep. Tr. at 255:14-256:8.

On the severity of Watson's distress, on the other hand, the Defendants' argument goes too far. The Defendants cite many cases in which "crying fits, anxiety, humiliation, grief, shame, embarrassment, sleepless nights and depression [were found to be] insufficient to support a cause of action for intentional infliction of emotional distress." Defs.' Br. at 17-18. But of course, any of those symptoms could be part of an experience of severe emotional distress—it depends on the facts of the particular case. The Defendants also argue that Watson did not seek medical treatment. *Id.* at 19. But seeking medical treatment is not required. *See Naeem v. McKesson Drug Co.*, 444 F.3d 593, 606 (7th Cir. 2006). In any case, Watson *sought* medical treatment for his emotional and psychological injuries when he was able to. PSOF ¶¶ 20-21. Especially given the way in which his emotional injuries have affected his ability to work (according to Watson), a reasonable jury might be able to find that they constitute severe emotional distress.

But because there is no genuine dispute of fact on either the issue of "extreme and outrageous" conduct or on the Defendants' intent, summary judgment must be granted on this claim anyway.

## 2. Negligent Infliction of Emotional Distress

Watson alleges a claim for negligent infliction of emotional distress based on the same actions by the AutoZone employees discussed above, *supra* Section III(B)(1). Pl.'s Resp. Br. at 14-18. "Generally, to state a claim for negligent infliction of emotional distress [under Illinois law], a plaintiff must allege the traditional elements of negligence: duty, breach, causation, and damages." *Schweihs v. Chase*

*Home Fin., LLC*, 77 N.E.3d 50, 58 (Ill. 2016). A direct victim must show that the defendant's actions were accompanied by a "contemporaneous physical injury or impact." *Id.* at 59. However, direct victims do *not* need to show that they experienced physical *symptoms* of emotional distress—emotional injuries alone are enough. *See Thornton v. Garcini*, 928 N.E.2d 804, 808-809 (Ill. 2010). Here, the Defendants argue that Watson has failed to establish a genuine dispute of fact as to whether they had a duty to avoid the emotional distress he has claimed, Defs.' Br. at 23; Defs.' Reply Br. at 17-19, and again that his distress was not severe enough to qualify for relief under the tort, Defs.' Br. at 23-25.

The Defendants are correct that the AutoZone employees breached no duty to Watson. Although every person owes another a duty of reasonable care, *Simpkins v. CSX Transp., Inc.*, 965 N.E.2d 1092, 1097 (Ill. 2012), the AutoZone employees had no duty to avoid Watson's emotional distress in the way he claims. His distress simply was not foreseeable. Again, he acknowledged the situation was such that he could have walked out. Pl.'s Resp. DSOF ¶ 25; Watson Dep. Tr. at 128:9-24. A situation that the victim can freely leave is not a situation in which a reasonable person could predict that he would be severely emotionally injured. Plus, Watson's instruction to Moore to "hit him," Pl.'s Resp. DSOF ¶ 17, sent a strong signal that he was okay under the circumstances.

The issue of the severity of Watson's distress is similar to that under the intentional emotional-distress claim discussed earlier in this Opinion. As a threshold matter, the parties seem to disagree on whether there is an increased threshold for

the severity of the distress that Watson must have experienced. But to be clear, while Illinois law may "distinguish between a claim for negligent infliction of emotional distress brought by a direct victim of an accident and one brought by a bystander," *Johnson v. Wal-Mart Stores, Inc.*, 587 F. Supp. 2d 1027, 1033 (C.D. Ill. 2008), this one was brought by a direct victim of an accident, so no increased standard of distress applies. In any event—although a reasonable jury might conclude that Watson's injuries constitute severe emotional distress—Watson's negligent emotional-distress claim fails because the AutoZone employees did not breach any duty to Watson.

### 3. Assault

Watson's next claim against the AutoZone employees is for assault. Pl.'s Resp. Br. at 18-22. In Illinois, a civil assault is "an intentional, unlawful offer of corporal injury by force, or force unlawfully directed, under such circumstances as to create a well-founded fear of imminent peril, coupled with the apparent present ability to effectuate the attempt if not prevented." *Parrish by Bowker v. Donahue*, 443 N.E.2d 786, 788 (Ill. App. Ct. 1982). Courts take the distance between the plaintiff and defendant at the time the threat is made as an important factor in determining whether assault occurred. *See Kijonka v. Seitzinger*, 363 F.3d 645, 646-48 (7th Cir. 2004) (no assault occurred where the defendant drove by the plaintiff slowly and yelled "[y]ou have a nice day and your ass is mine you son of a bitch and I will get you"); *People v. Rynberk*, 415 N.E.2d 1087, 1090-91 (Ill. App. Ct. 1980) (assault may have occurred where defendant approached wheelchair-bound victim "to within a foot" and threatened to "beat her head in.").

The Defendants argue that the facts set out by Watson do not justify a "well-founded fear of imminent peril." Defs.' Br. at 25-28. Here, it is necessary to separately evaluate Watson's claim against Moore, who Watson says never touched him, and the other employees, who Watson says yanked at him and stomped on his feet. Watson claims that Moore came towards [him] as if he was going to attack [him] … in an aggressive and imposing manner, standing an inch or two way from [] Watson's face." Defs.' Resp. PSOF ¶ 3. In his deposition, Watson stated that Moore was "at him." Watson Dep. Tr. at 25:14-26:8. The Defendants' primary argument, as applied to Moore, seems to be that Moore is not claimed to have *said* anything to Watson as this happened. Defs.' Br. at 27-28; Defs.' Resp. PSOF ¶ 3. But words are not strictly required for an assault claim under Illinois law. *Kijonka*, 363 F.3d at 647. Instead, assault requires "a threatening gesture, *or* an otherwise innocent gesture made threatening by the accompanying words." *Id.* (emphasis added). Here, Watson has argued that Moore's gesture—his quick approach to stand close to Watson's face—was in and of itself threatening. Given Moore's rapid approach, the way he positioned himself an inch or two from Watson's face, and the similarity of his size and age to Watson's, there is a genuine dispute of material fact on assault as to Moore. *See* Defs.' Resp. PSOF ¶ 3; Watson Dep. Tr. at 25:14-26:8.

There is likewise a dispute of material fact as to the other AutoZone employees. The case is easier for the others because Watson testified that they actually used threatening words against him while in close proximity. *See, e.g.*, Watson Dep. Tr. at 142:5-9 ("They was yelling and cussing … ."); *id.* at 144:1-5 ("They said a lot … [t]hey

said … bitch ain't taking shit out of here."); *id.*: at 144:16-19 (testifying that both women were "all over" him and "in front of" of him). *See also* Garner Dep. Tr. at 48:19-49:6 ("[H]e [AutoZone employee] was joined by some female workers, at least two, and they surrounded Mr. Watson and they were jostling and bumping him and they were acting like they were a street gang … telling him that he needed to get out of here, don't come in here messing with us … ."). The AutoZone employees also pulled at the battery in his hands, stood close to him, and eventually yanked on his arm and stomped on his feet. Defs.' Resp. PSOF ¶ 4; Watson Dep. Tr. at 142:5-12. Those facts—if proven—would clearly be enough to allow a reasonable jury to find an assault. The Defendants argue that Watson's belief that he could maintain his grip on the battery defeats the assault claim. *See* Defs.' Br. at 27. Watson rightly points out that it does not, *see* Pl.'s Resp. Br. at 20—Watson's ability to keep the battery in his hands does not have any bearing on whether he reasonably feared being hit or otherwise battered by the employees.

One further note: Watson's assault claim against the AutoZone employees other than Moore could be redundant with his battery claim—in his account, the employees *did* batter him—not just assault him. It could be that the jury will find there is sufficient evidence to hold the employees liable for battery instead of assault, or that the jury will find that they only assaulted him and did not batter him. But if the evidence at trial is incompatible with either of those possibilities, the Court will entertain a Rule 50 motion.

## 4. Battery

Finally, Watson claims that the AutoZone employees, including Moore, committed a battery against him. To prevail on a claim of battery, a plaintiff must show that "the defendant intended to cause a harmful or offensive contact and that a harmful or offensive contact resulted." *Happel v. Wal-Mart Stores, Inc.*, 737 N.E.2d 650, 657 (Ill. App. Ct. 2000). Under Illinois law, "there exists a dichotomy within the intent requirement for the tort of battery, *i.e.*, whether intent equates to an intent to harm or offend, or merely an intent to touch." *Bakes v. St. Alexius Med. Ctr.*, 955 N.E.2d 78, 85 (Ill. App. Ct. 2011). *But see* Defs.' Br. at 29 ("Plaintiff has not demonstrated that these actions caused bodily harm nor has he demonstrated that the AutoZone employees *intended* to cause him bodily harm."). In any event, here, there is a clearly disputed issue of material fact even on the stricter intent-to-harm (or offend) requirement.

For one, the AutoZone employees' actions—when viewed in Watson's favor—permit no other conclusion except an intention to harm or offend. Even if the employees were trying to stop what they thought was an attempted theft, they could have tried blocking Watson's movements. Instead, Watson has offered evidence that the AutoZone employees "stomped on his feet, and yanked on [his] arms so hard that he was yanked around the store." Watson Dep. Tr. at 142:5-12; *see also* Garner Dep. Tr. at 48:19-49:6, 50:22-51:7. A jury could reasonably infer that the employees intended to offend Watson or cause him bodily harm in order to stop him from taking the battery. *Cf. Bakes*, 855 N.E.2d at 86-87 (explaining that under Illinois law, "the

threshold for what constitutes an 'offensive' touching is low."). Moreover, there is no question that yanking and stomping constitute an offensive touch—and in fact, Watson raised a reasonable inference that it might be partly the cause of his injuries. For these reasons, summary judgment must be denied against the AutoZone employees who yanked at Watson and stomped on his feet.

On the other hand, Watson has admitted that Moore did not touch him at any point. Defs.' Resp. PSOF ¶ 3; Watson Dep. Tr. at 255:14-26:8; Pl.'s Resp. DSOF ¶ 17. So summary judgment is granted on this claim as to Moore.

### C. State Law Claims as to CPD Officers

The Defendants also advance two arguments on Watson's state law claims against the CPD Officers: (1) that their conduct was justified, and (2) that their actions did not constitute willful and wanton conduct and so, they are immune from state law liability under the Illinois Tort Immunity Act. Defs.' Br. at 30-31. As discussed above, a reasonable jury could find that the alleged force used against Watson was excessive, which means that it could not have been justified. *See, e.g.*, *Graham*, 490 U.S. at 397 ("[A]n officer's good intentions [cannot] make an objectively unreasonable use of force constitutional."); *Fitzgerald v. Santoro*, 707 F.3d 725, 733 (7th Cir. 2013) (explaining that a seizure accomplished through excessive force violates the Fourth Amendment even if supported by probable cause).

Similarly, a reasonable jury could also conclude that the Defendants are not immune from state law liability under the Illinois Tort Immunity Act. Under Illinois law, "[a] public employee is not liable for his act or omission in the execution or

enforcement of any law unless such an act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202. Willful and wanton conduct "consists of more than mere inadvertence, incompetence, or unskillfulness." *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 920 (7th Cir. 2015) (cleaned up). Specifically, "willful and wanton conduct" is defined as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210. "The question of whether [a] defendant is liable for willful and wanton behavior is ordinarily a question for the jury." *Geimer v. Chicago Park Dist.*, 650 N.E.2d 585, 592 (Ill. App. Ct. 1995). Summary judgment may be granted, however, if the evidence, viewed in the light most favorable to the non-movant, "so overwhelmingly favors the movant that no contrary verdict … could stand." *See id.* (collecting cases).

Here, the Defendants' alleged excessive force could amount to willful and wanton conduct. Both Officers Fulton and Feazell threatened Watson with physical force. Watson Dep. Tr. at 172:12-14. While Fulton was asking Watson to tell him what happened (and before he began pushing Watson out of the store), Fulton "told [Watson] to shut up, threatened to throw [him] out of the [] store, [and] threatened to body slam [him]."[9] Pl.'s Resp. DSOF ¶ 40 (citing Watson Dep. Tr. at 165:8-166:5); *see* Garner Dep. Tr. at 63:2-10. Later, when Watson stood still in response to Fulton's push, Officer Feazell also threatened to body slam Watson. Watson Dep. Tr. at 167:9-

---

[9]Again, although Watson's testimony does not identify Officer Fulton by name, the Court assumes Fulton made this particular threat because the parties do not dispute that he was the one who asked Watson what happened, Pl.'s Resp. DSOF ¶ 34, and who grabbed Watson's right arm behind his back, *id.* at ¶ 43.

12. Even though the officers did not *actually* body slam him, their threats suggest that they exercised a deliberate choice on the level of force they ultimately used. *See Chelios v. Heavener*, 520 F.3d 678, 693 (7th Cir. 2008) (where officer's thought process prior to alleged force could raise inference that the force was "intentional" and "calculated," a jury could reasonably conclude that the conduct evinced an "actual or deliberate intention to harm."). In fact, as previously discussed, the evidence suggests that the officers applied significant force without provocation—they did not even ask Watson to leave the store first, even though he did not pose a threat, had not committed a violent crime (if any), and was not actively resisting. Under these circumstances, the choice to twist Watson's arm behind his back, grab his shoulder, lift him by his armpits, roughly shove him through the door, and otherwise manhandle him, *see* Watson Dep. Tr. at 172:15-173:3; Garner Dep. Tr. at 64:11-18, 65:15-22, 68:6-11, could constitute a conscious disregard for his safety. *See Owusu v. Grzyb*, 749 F. Supp. 897, 900, 906 (N.D. Ill. 1990) (where police officers shoved, wrestled, and handcuffed plaintiffs without provocation—after plaintiffs had refused to hand over children in a custody dispute, but said the officers themselves could take them—"a jury could find that the … defendants' acts … were committed with actual or deliberate intention to harm or with an utter indifference to or conscious disregard for the safety of others." (cleaned up)). In this case, although the "factual question certainly is a close one[,]" viewing the facts in the light most favorable to Watson means "he is entitled to have a jury determine whether the [CPD Defendants]

engaged in actions for which [they] can be held liable under Illinois law." *Chelios*, 520 F.3d at 693.

In sum, because a reasonable jury could conclude that the alleged excessive force was willful and wanton—and, by extension, that the CPD Defendants are not immune from state law liability—Watson's assault, battery, and intentional emotional-distress claims against the CPD Defendants survive.[10] On the other hand, Watson's claim for negligent emotional-distress against the CPD Defendants is dismissed as a matter of law, because § 10/2-202 only permits liability for willful and wanton conduct, meaning that public employees are specifically exempt from negligence liability. *See* 745 ILCS 10/2-202; *Hicks v. City of O'Fallon*, 2019 IL App (5th) 180397, at ¶¶ 44, 46 (explaining that § 10/5-106 of the Tort Immunity Act— which contains a "willful or wanton" exception—"has generally insulated public entities and the employees who operate ambulances from negligence liability[,]" in part because "willful and wanton conduct, *unlike negligence*, requires a heightened state of mind" (emphasis added)); *Allen v. City of Zion*, 2003 WL 22078374, at *4 (N.D. Ill. Sept. 3, 2003) ("Since 745 ILCS § 10/2-202 specifically exempts public employees from negligence liability in the execution or enforcement of the law, plaintiff cannot

___

[10]Because the Defendants failed to make any arguments that Watson's state law claims should be dismissed even absent tort immunity (or even if the Defendants' conduct was not justified), the Court will not address those claims on the merits. *See Hopkins v. Bd. of Ed. of City of Chicago*, 73 F. Supp. 3d 974, 983 n.8 (N.D. Ill. 2014) ("Arguments not raised in an opening brief are deemed forfeited.") (citing *United States v. Boyle*, 484 F.3d 943, 946 (7th Cir. 2007)). Even so, Watson might be well advised to consider dropping the intentional emotional-distress claim: it does not offer higher damages than the surviving § 1983 claims and—at least on this record—Watson is unlikely to meet the higher burden of "extreme and outrageous," so he faces a possible mid-trial Rule 50 finding on this claim.

rely on the 'special duty' exception to maintain a negligence cause of action against police officers who injured him during an arrest.").

## D. *Respondeat Superior*

The next issue up for review is Watson's claim that both AutoZone and the City of Chicago are liable for the actions of their respective employees under *respondeat superior*. Am. Compl. ¶¶ 74-78. The Defendants' sole argument on this point is that Watson "has failed to establish the occurrence of any underlying tort." Defs.' Br. at 31. Not only is this wrong, *see supra* Sections III(B)-(C), but the Defendants have also forfeited any other arguments they may have against *respondeat superior* liability (at least at this stage of the litigation).

In any event, the *respondeat superior* theory of liability is not applicable to § 1983 claims. *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) ("The doctrine of *respondeat superior* does not apply to § 1983 actions; thus to be held individually liable, a defendant must be personally responsible for the deprivation of a constitutional right."). So there is no *respondeat superior* liability on the federal law claims. But Watson *has* established that he is entitled to pursue *respondeat superior* liability on the *state* law claims. Under Illinois law, "an employer can be liable for the torts of an employee, but only for those torts that are committed within the scope of the employment." *Bagent v. Blessing Care Corp.*, 862 N.E.2d 985, 991 (Ill. 2007). An employee's conduct is within the scope of employment if: "(a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the master." *Id.*

at 992. "[S]ummary judgment is generally inappropriate when scope of employment is at issue," and may only be granted "when no reasonable person could conclude from the evidence that an employee was acting within the scope of employment." *Id.* at 995.

Here, Watson has provided evidence that he was assaulted and battered inside an AutoZone store, Pl.'s Resp. DSOF ¶¶ 17, 23, by AutoZone employees who thought he was trying to steal a product belonging to their employer, *id.* at ¶ 37. This is enough to raise the inference that the AutoZone employees were acting within the scope of their employment. Similarly, the CPD Defendants were employed by the City of Chicago, DSOF ¶ 3, responded to a 911 call from the AutoZone store, Defs.' Br. at 1, and tried to "conduct an investigation[,]" and "de-escalate the situation[,] *id.* at 30. These facts certainly permit the conclusion that the CPD Defendants were acting within the scope of their employment. *See, e.g., Banks v. City of Chicago*, 297 N.E.2d 343, 349 (Ill. App. Ct. 1973) ("The nature of a policemen's job is that he be fit and armed at all times … and subject to respond to any call to enforce the laws and preserve the peace."); *id.* (explaining that acts of a police officer taken to "prevent the commission of crime in his presence" are within the scope of their employment, even if the officer is off-duty). So Watson is entitled to pursue his surviving state law claims against AutoZone and the CPD Defendants under a *respondeat superior* theory.

## IV. Conclusion

For the reasons explained above, with respect to AutoZone, the Defendants' motion for summary judgment is granted on Watson's claims for intentional and

negligent emotional distress; denied on the battery and assault claims; and denied on the *respondeat superior* claim. As to the CPD Defendants, the motion is denied on Watson's excessive-force claim; granted on the failure to intervene claim against Officers Fulton, Jefferson, and Smith; denied on the failure to intervene claim against Officer Feazell; denied on the battery, assault, and intentional emotional-distress claims; granted on the negligent emotional-distress claim; and denied on the *respondeat superior* claim to the extent premised on the § 1983 claims. Before the next status hearing, the parties shall confer on whether a settlement conference is warranted, or instead whether a trial date must be set. The status hearing of March 26, 2020, is reset to April 13, 2020, at 9:30 a.m.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 16, 2020