UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| James Watson, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:15-CV-11559 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| Antonio Fulton, Keion Feazell, | ) | |
| Leo Jefferson, Jeffery Smith, | ) | |
| Anthony Smith, City of Chicago, and | ) | |
| AutoZone, Inc., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

James Watson brought this § 1983 civil-rights action against Chicago Police Officers Antonio Fulton and Keion Feazell, as well as the City of Chicago, for injuries that Watson allegedly suffered during an altercation at an AutoZone store. R. 41, Am. Compl.[1] Watson's claims against the officers—federal claims for excessive force and failure to intervene, and state law claims for assault and battery and intentional infliction of emotional distress—proceeded to a jury trial.[2] After a three-day trial, the jury found in favor of the Defendants on all counts.[3] R. 331 (sealed); R. 333.

---

[1]Citations to the record are "R." followed by the docket entry number and, if needed, a page, paragraph, or line number.

[2]As to the City of Chicago, the Court granted the defense's request to bifurcate Watson's indemnification and respondeat superior claims. R. 284, Post-PTC Order at 4. Because the potential liability of Chicago was premised solely on the potential liability of the individual defendants, the entire case was dismissed after the verdict.

[3]Because this action was brought under 42 U.S.C. § 1983, this Court has subject matter jurisdiction over the case under 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

Watson now moves for a new trial under Federal Rule of Civil Procedure 59(a), asserting that (1) the jury's verdict was against the manifest weight of the evidence; (2) the Court made errors in empaneling the jury; and (3) the Court made erroneous evidentiary rulings. R. 338. For the reasons discussed below, the motion is denied.

## II. Standard of Review

Watson moves for a new trial under Civil Rule 59, which can be granted only "if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Bowers v. Dart*, 1 F.4th 513, 521 (7th Cir. 2021) (cleaned up).[4] In reviewing a motion for a new trial, "the district court has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Galvan v. Norbert*, 678 F.3d 581, 588 (7th Cir. 2012) (cleaned up). This power to consider the weight of the evidence, however, "is not unlimited: a certain deference to the jury's conclusions is appropriate." *Id.* (cleaned up). The district court is "bound to the same evidence the jury considered," and it "cannot remove a piece of evidence from the calculus merely because the court believes it was not credible and then, with that piece excluded, grant a motion for a new trial because the verdict is now against the weight." *Id.* (cleaned up). Rather, the district court must generally weigh all the evidence presented at trial and determine whether the verdict is contrary to the evidence's manifest weight. *See Whitehead v. Bond*, 680 F.3d 919, 929 (7th Cir. 2012)

---

[4]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

(emphasizing that the district court properly relied on "all the evidence" and applied the proper standard).

## III. Analysis

### A. Weight of the Evidence

Watson argues that a new trial is warranted because the jury's verdict for the defense was contrary to the manifest weight of the evidence presented at trial. R. 339, Pl.'s Br. 2–3. To support this argument, Watson points to various inconsistencies in the testimony of defense witnesses, including:

> 1. The defendants testified that they heard yelling when they arrived at the AutoZone, whereas an AutoZone employee testified that the "ruckus had subsided" after the police were called.
>
> 2. Officer Fulton testified that he did not see or hear Watson leave the store and did not feel any cold air coming from the door. But Feazell testified that it was a cold day and that he held the door open while talking to Watson, and that the AutoZone was a small place. Additionally, James Garner (one of Watson's witnesses) and AutoZone employees stated that they saw both officers leave the store with Watson.

Pl.'s Br. at 3; R. 345, Pl.'s Reply at 2. According to Watson, these discrepancies are "so incredible" that the verdict could not "pass muster in the reasonable mind." Pl.'s Reply 2 (quoting *United States v. Chancey*, 715 F.2d 543, 547 (11th Cir. 1983)).

These purported flaws in testimony are a far cry from what is required to overturn a jury verdict. Indeed, some of the examples may not be inconsistencies at all. It is more than feasible, for instance, that Officer Fulton did not realize in the moment that Watson had exited the AutoZone, and did not notice any cold air from the door being propped open—even if Feazell in fact held the door open on a cold day, and even if the AutoZone was indeed a small space. And, at a minimum, to the extent

3

that Watson has identified actual inconsistencies, the effect is not as momentous as he makes it out to be. The cited inconsistencies are no worse than those found in a typical case, and they pertain to minor details that are not so serious as to render any of the witnesses' testimony unbelievable.[5] Indeed, it is the rare trial in which either side's case is entirely consistent with all of the evidence—including its own. And, in any event, juries "may reject parts of a witness's testimony while accepting other parts." *United States v. Lawson*, 810 F.3d 1032, 1039 (7th Cir. 2016).

What's more, the minor discrepancies that Watson points out are outweighed by the evidence presented at trial that supported the jury's verdict. For example, Watson's overall claim was that Officer Fulton used excessive force on him by forcefully holding his right arm behind his back and shoving him out of the AutoZone, while Feazell stood there and failed to intervene. R. 335, Tr. Vol. I-B, at 133:5–134:6. But James Garner, a key witness for Watson, testified (by deposition) that Watson's "arms were down" at his side when the officers had ahold of Watson, and that the officers had instead "put their hands on his clothing." R. 336, Tr. Vol. II, at 266. In other words, Garner's testimony contradicted Watson's account that Fulton "twisted [his] right arm" behind his back and thereby injured him. Tr. Vol. I-B, at 227. Indeed, several other witnesses' testimony contradicted Watson's account. Fulton himself testified that he did not touch Watson at all, Tr. Vol. II, at 276:17–19, which was

---

[5]Although Watson relies on *Chancey*, an Eleventh Circuit case, the internal inconsistencies here are not comparable to those in that case. Pl.'s Reply 2; *Chancey*, 715 F.2d at 547 (discussing that victim's own testimony about her conduct, like "walking hand in hand in the presence of others" with the defendant and "riding piggyback in a public place," could not "pass muster in the reasonable mind that an individual is being detained and transported against his or her will").

4

supported by the testimony of Vanessa Frazier, an AutoZone employee. *Id.* at 370:4–8. Likewise, AutoZone employee Shan Moore also testified (by deposition) that he did not see the officers grab Watson's arm and twist it behind his back or otherwise shove Watson. Tr. Vol. II, at 397:15–398:8. After reviewing and weighing all the evidence, the credibility of the witnesses, and the comparative strength of the facts presented at trial, the Court concludes that the manifest weight of the evidence is not against the jury's verdict. What's more, "[j]ury verdicts deserve particular deference in cases," like this one, in which there are "simple issues but highly disputed facts." *Moore*, 546 F.3d at 427 (cleaned up). In sum, the weight of the evidence supports the verdict.

**B. Jury Selection**

Watson next argues that a new trial is warranted because of errors that the Court made in empaneling the jury. He contends that the voir-dire questioning precluded him from discovering jurors with pro-police biases. Pl.'s Br. at 13–14. Watson also challenges the Court's decision to dismiss three potential jurors for cause. *Id.* at 14.

**1. Voir Dire Questions**

Watson argues that the Court's voir dire questionnaire omitted questions that would root out prospective jurors with a pro-police bias, that is, jurors that "would have a concern rendering a verdict against a police officer." Pl.'s Br. 14. For instance, Watson argues that certain questions he had previously proposed—such as asking whether the jurors "supported Blue Lives Matter, contributed to police charitable organizations, had opinions about the media portrayals of members of law

5

enforcement, respected police officers or whether it was appropriate for police officers to use force against suspect"—should have been included in the questionnaire. Pl.'s Br. 14. Watson asserts that by rejecting these questions, the Court's questionnaire "tilt[ed] the jury selection process towards finding those with biases against the police, but not those who were pro-police other than those with law enforcement relatives or the like." *Id.*

But the questions included in the questionnaire were neutrally phrased and sufficiently broad to unearth any law enforcement related biases—including pro-police ones. The questionnaire asked the veniremembers, "Do you have any *positive* or negative experiences with, *or strong feelings* about, [the Chicago Police Department] … that would prevent you from being fair and impartial in this case?" R. 297-1, Jury Questionnaire at 3 (emphases added). It also asked whether they or close family members have had any "strongly negative *or strongly positive* experience with law enforcement." *Id.* Plus, the questionnaire asked whether the veniremembers or their close family members had ever worked for a law enforcement agency, or had been ever been investigated, charged, arrested, or convicted of a crime. *Id.* These neutral questions sought to uncover *any* biases regarding law enforcement and were broad enough to adequately discover the pro-police biases that Watson's proposed questions sought to uncover. *See* R. 297, 5/2/22 Minute Entry (explaining that it was unnecessary to include all of Watson's police-related questions because they would be "adequately covered" by the questionnaire and "memorable experiences with law enforcement w[ould] be asked about" during voir dire). Lastly, the questionnaire

6

included a catch-all question that asked, "Is there anything else … that could prevent you from serving as a fair and impartial juror in this case," and the Court also provided both parties the opportunity to ask follow-up questions. Jury Questionnaire at 3; *e.g.*, R. 334, Tr. Vol. I-A, at 21:4–8. In sum, the voir dire struck a balance between trying to unearth biases and, at the same time, avoiding an unnecessarily long jury selection process. A new trial is not warranted on this ground. *See Fietzer v. Ford Motor Co.*, 622 F.2d 281, 286 (7th Cir. 1980) (requiring that the court's method for testing impartiality create "a reasonable assurance that prejudice would be discovered if present"); *Alcala v. Emhart Indus., Inc.*, 495 F.3d 360, 363 (7th Cir. 2007) ("The district court has "broad discretion in determining how best to conduct voir dire.").

### 2. For-Cause Challenges

Watson also asserts that the Court erred when it dismissed three potential jurors for cause. As noted earlier, as part of the voir dire, the Court gave prospective jurors a questionnaire, which the Court compiled after reviewing the parties' proposed voir dire questions. The questionnaire sought to obtain general background information from the prospective jurors and to uncover possible biases. *See* R. 297-1, Jury Questionnaire. During jury selection, the Court asked the jurors follow-up questions based on their questionnaire responses, and ultimately dismissed Ms. Quovadis Robinson, Ms. Anja Clarizio, and Ms. Adrian Guiliano in light of their negative experiences with law enforcement or their negative perceptions of law enforcement.

7

Watson argues, without much elaboration, that these three jurors should not have been dismissed for cause because they each stated to the Court at some point that they could remain impartial. Pl.'s Br. 14; Pl.'s Reply 9. Watson contends that none of the three jurors demonstrated "the kind of extreme bias that suffices to dismiss a juror for cause." Pl.'s Reply 9.

When scrutinizing the impartiality of a prospective juror, trial courts ask "whether the juror can put aside the experiences and beliefs that may prejudice his view of the case and render a verdict based on the evidence and the law." *United States v. Taylor*, 777 F.3d 434, 441 (7th Cir. 2015). Dismissal is appropriate if a prospective juror's voir dire responses "reveal a bias so strongly as to convince the judge that the juror cannot render impartial jury service …." *Marshall v. City of Chicago*, 762 F.3d 573, 575 (7th Cir. 2014); *id.* ("[T]he voir dire process aims to weed out jurors who hold personal biases so strong that their ability to act as a neutral arbiter is compromised."). Trial courts are entitled to "great deference" when striking jurors based on bias, because they have a "unique opportunity to assess the credibility of the jurors during voir dire examination, as well as their demeanor throughout the course of trial." *United States v. Barnes*, 909 F.2d 1059, 1070–71 (7th Cir. 1990).

During the voir dire examination, the Court—after following up during side bars with each of the three jurors at issue—determined that Robinson, Clarizio, and Giuliani held biases that precluded them from rendering impartial jury service. Robinson explained that her cousin had been racially profiled and detained by the police in Chicago, and that her cousin had been devastated by the experience. When

8

the Court asked Robinson whether she would be able to evaluate police officer testimony the same way she would evaluate the testimony of anyone else, she responded, "To be completely honest, I would definitely have [the experience] in the back of my head, but I would try my best to be as fair as possible. … But it is something that's dear to me …." Tr. Vol. I-A, at 47. Although Robinson then said that she "would try [her] best" to set aside her cousin's experience for purposes of deciding the case, she expressed hesitation in being able to do so:

> The Court: Are you confident that you can do that?
>
> [Robinson]: I think so. I haven't been in it, so, you know, I don't—*I can't exactly say*.

*Id.* at 48 (emphasis added).

Similarly, Clarizio explained that her husband had a negative interaction with law enforcement when an officer falsely accused him of throwing garbage out of his car and arrested him. *Id.* at 68. When the Court followed up with Clarizio and asked whether she could "set aside for purposes of this case that experience and give both sides a fair trial," Clarizio responded, "I'm going to say no." *Id.* at 68. Although Clarizio did, at one point, say that she could assess the case impartially, *id.* at 70, she emphasized that she was biased in favor of Watson:

> The Court: Standing here right now, you are already in your mind giving one side or the other a head start?
>
> [Clarizio]: I'm going to be honest and say yes.
>
> The Court: Who is getting the head start?
>
> [Clarizio]: I believe the plaintiff.

9

*Id.* at 70.

Likewise, Giuliani stated that she believed the Chicago Police Department "has been racially profiling and using excessive force on minorities in the city for years." *Id.* at 84. She also explained that a close family friend had been subject to racial profiling and was "roughhoused" by law enforcement, and that this incident was "really upsetting" to her. *Id.* at 84–85. When the Court asked Giuliani whether this incident would affect the way she would weigh the officers' testimony in this case, Guliani ultimately answered that she thought she "would have difficulty" setting aside the incident and her negative feelings about officers. *Id.* at 86.

The Court found that these three potential jurors could not render impartial jury service. Although some of their responses, taken in isolation, purported to say that they might be able to remain impartial towards police officers, the Court concluded—based on the veniremembers' responses to the questionnaire, their responses to the Court's follow-up questions, and the Court's in-court observations—that they would not be able to put aside their experiences and beliefs that may prejudice their view of the case. *See Patton v. Yount*, 467 U.S. 1025, 1039 (1984) ("Jurors … cannot be expected invariably to express themselves carefully or even consistently[;] … under our system it is th[e] judge who is best situated to determine competency to serve impartially."). Watson is not entitled to a new trial based on the for-cause decisions.

## C. Evidentiary Rulings

In seeking a new trial, Watson also contests five evidentiary decisions made by the Court: four motion-in-limine decisions and a set of deposition-designation decisions. A party seeking a new trial based on erroneous evidentiary rulings bears a "heavy burden." *Alverio v. Sam's Warehouse Club*, 253 F.3d 933, 942 (7th Cir. 2001). This is because "[t]he decision whether to admit evidence is a matter peculiarly within the competence of the trial court …." *Manuel v. City of Chi.*, 335 F.3d 592, 595 (7th Cir. 2003). So, even if the trial court's decision was erroneous, a "new trial is warranted only if the error had a substantial and injurious effect or influence on the determination of a jury and the result is inconsistent with substantial justice." *Lewis v. City of Chi. Police Dep't*, 590 F.3d 427, 440 (7th Cir. 2009). A new trial is not warranted if the erroneous decision was "harmless," that is, "if the record indicates the trial result would have been the same." *Id.*

### 1. Watson's Motion in Limine No. 1 (Prior Conviction)

Before the pretrial conference, Watson filed a motion to exclude evidence of his criminal history, including a prior January 2022 conviction for felony possession of a controlled substance. R. 271, Pl.'s MILs at 4. The Court determined that evidence of the felony drug possession offense was allowed under Federal Rule of Evidence 609. R. 280, Pre-PTC Order at 1–2; *see Schmude v. Tricam Indus., Inc.*, 556 F.3d 624, 627 (7th Cir. 2009) ("A rule is a rule; Rule 609 does permit the use of a felony conviction to impeach a witness."). The Court then undertook a Rule 403 analysis to consider whether there would be significant risk of undue prejudice in allowing Watson's

11

criminal history. Pre-PTC Order at 2. Based on this analysis, the Court held that only the felony drug possession conviction—and not any other criminal history—was allowed. Also, even as to the allowed conviction, the Court placed limitations to ensure there would be no undue prejudice to Watson. The Court explained:

> Given the underlying rationale of impeachment-by-conviction under Rule 609, and given the recency of the conviction (just earlier this year), the conviction is relevant to character for truthfulness. It is true that there is reason to question the probative force of drug possession convictions on truth telling, at least in comparison to deceit-based convictions. But to exclude this conviction would effectively eliminate Rule 609 for non-deceit offenses. And possession of a controlled substance, with a resulting sentence of probation, is not likely to inflame the jury. Drug possession is not akin to a murder conviction, which might cause the jury to be "appalled by his prior conduct that has nothing to do with the events in question." There is no need, however, to describe the drug at issue. So the defense may elicit, for Rule 609 impeachment purposes only, that Watson has been convicted of possession of a controlled substance; it was a felony; when the conviction happened; and the 24-month probation sentence.

Pre-PTC Order at 2 (footnote and citation omitted).

In the new-trial motion, Watson challenges this decision. He makes the same argument as he did in his pretrial motion for limine, that because Watson's drug possession conviction "did not rest on underlying facts revealing fraud or deceit," evidence of that conviction was not admissible under Rule 609. Pl.'s Br. at 5. He also argues that the probative value of the conviction evidence was "negligible" and outweighed by the risk of unfair prejudice against Watson. These arguments are again rejected for the reasons previously articulated. *See* Pre-PTC Order at 2.

### 2. Watson's Motion in Limine No. 3 (Victim of Crimes)

Watson also filed a motion in limine to exclude evidence of Watson's history as a victim of crimes. Pl.'s MILs at 8–10. Watson had previously been stabbed, robbed

12

at gunpoint, and carjacked, and the defense wanted to offer evidence of those instances to show the jury that Watson did not suffer from the alleged conduct to the extent that he alleged, given that he did not suffer much from past instances of violence. *See* R. 273, at 4-5; Pre-PTC Order at 3. Watson argued that the evidence of his victim history was irrelevant because there is a distinction between attacks by ordinary persons and attacks by police officers, who are supposed to help him. R. 271, at 8–9. Watson also raised concerns that the evidence would "link" him to a violent background. *Id.*

Before the pretrial conference, the Court informed the parties that further discussion on this issue was needed, and instructed the defense to elaborate at the pretrial conference as to the factual premise for its assertion that Watson did not suffer much from the past violent experiences. R. 280 at 3–4. At the pretrial conference, the defense did so, identifying specific excerpts from Watson's deposition in which he stated that the prior violent attacks did not result in crying, nightmares, or a lack of motivation. R. 283, PTC Tr. 4:10–5:1. The Court then decided that Watson's motion to exclude his victim history was denied, explaining that the evidence was relevant "to Watson's extraordinary fortitude (if the deposition testimony is credited) against emotional distress from violence." Post-PTC Order at 2. And, the Court reasoned, "the distinction that Watson draws between an ordinary attacker and a police officer goes to weight rather than its admissibility." *Id.* But the Court placed tight limitations on this evidence in order to prevent any Rule 403 risks, instructing that there could be no hint at trial that Watson was to blame for any of

13

the prior attacks, and that there should be very little evidence elicited about the lead-up to his being attacked. *Id.* The Court also required the parties to confer on how to introduce the evidence, and the evidence was indeed introduced in accordance with the parties' agreement. R. 288.

Watson, again asserting the distinction between ordinary attackers and police officers, argues in his motion for new trial that his victim history should have been excluded because it "provided no probative value regarding any issue in this case" and was highly prejudicial to him. Pl.'s Br. at 7. For the same reasons provided in the Court's post-conference order, the Court rejects Watson's arguments. Post-PTC Order at 2. The evidence of Watson's fortitude following prior violent attacks was relevant to the alleged damages here. And the Court's limitations on how the victim history evidence was presented safeguarded against undue prejudice against Watson. A new trial is not warranted on this ground.

### 3. Defense Motions in Limine Nos. 9 and 20
### (References to the City of Chicago)

The defense filed motions in limine to exclude any references to the City of Chicago as a defendant, as well as to indemnification by the City (essentially seeking to bifurcate the indemnification and respondeat superior claims against the City). The defense—concerned about signaling to the jury that there were "deep pockets" available to pay the judgment in this case—wanted to prevent impermissible inflation of the damages award. R. 270, at 15, 24. Watson objected, arguing that granting the motion would create the impression that the officers would pay damages out of their

14

own pockets and risk prejudicing the jury's evaluation of liability or damages. R. 274, at 12.

The Court explained in its pretrial order that it "generally does believe that bifurcation of indemnification and respondeat superior claims is appropriate," but only if the City "expressly agrees that if Watson wins a judgment on compensatory damages, then the Court will enter judgment against the City" on the indemnification claims and on the respondeat superior claims, and "in the amount of compensatory damages awarded against the Defendants." Pre-PTC Order at 9. At the pretrial conference, the City expressly agreed that it would accept entry of judgment if the officers were found liable. PTC Tr. 26:21–25. On Watson's concern about the bifurcation's effects on the jury's evaluation, the Court determined that "it is more likely for a jury to artificially inflate a damages award if they know that the City will pay the award than it is for a jury to artificially reduce an award if they suspect that officers will have to pay out of their own pockets." R. 284, Post-PTC Order at 4. Accordingly, the Court granted the defense's motions. *Id.*

Watson challenges this decision, again arguing that the bifurcation was improper because "the jury likely assumed that the Defendant Officers would have had to pay" the damages and attorneys' fees, and such a "wrong impression by the jury was prejudicial to the jury's evaluation" of Watson's claims. R. 339, Pl.'s Br. 10. Again, for the reasons discussed in the prior orders and at the pretrial conference, this argument is unavailing.

15

### 4. Defense's Motion in Limine No. 25
### (Defendants' Presence at Depositions)

The defense also filed a motion in limine to bar Watson from presenting evidence about whether the defendants were present at each other's depositions. R. 270. The defense argued that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice because the parties had a right to attend all depositions, *see* 28 U.S.C. § 1654, and also because the deposition transcripts did not clearly list which parties (if any) were present at the depositions. R. 270, at 29; PTC Tr. 31:15–32:10. Watson sought to introduce this evidence to show that the Defendants had an opportunity to coordinate their stories by attending the other's deposition. PTC Tr. 28:18–29:5. But Watson was unable to direct the Court to anything concrete in the record to support this coordination theory. PTC Tr. 30:2–13.

After hearing from both parties at the pretrial conference, the Court agreed with the defense and granted the motion, providing the following rationale:

> Watson was unable to articulate any specific reason to think that coordination happened (such as a change in answer after a break, or non-verbal signals to the deponents). And parties do have a right to be present at a deposition, a legal principle that the Court would have to explain to the jury if the Defendants' presence were introduced at trial. There is insufficient probative value on this coordination theory when compared to the substantial Rule 403 problems. As part of that time wasting, the Court notes that there is no clear record of which Defendant (if any) was present at the depositions, because the transcript for some reason did not include an "also present" section.

Post-PTC Order at 5; *see also* PTC Tr. 32:11–33:10. Watson challenges this decision, repeating his argument that "there were no Rule 403 problems" with this evidence. Pl.'s Br. at 10. The Court again rejects this argument for the reasons stated in its prior order, and a new trial is not warranted on this basis.

**5. Testimony of Frazier and Moore**

Watson also challenges the Court's decisions allowing into evidence the deposition testimony of Vanessa Frazier and Shan Moore, two AutoZone employees. Pl.'s Br. 11–13. First, Watson argues that their testimony should not have been allowed because "neither witness had personal knowledge of the facts." *Id.* at 11.

Both Frazier and Moore were present in the store as the alleged incident unfolded. *E.g.*, Tr. Vol. II, at 358:3–6, 397:25–398:2. Watson, however, relies on the fact that Frazier testified that she "went back to work" when the police arrived at the Autozone, that she did not "recall what happened," and that the officers talked to Watson for "a couple of seconds. Pl.'s Br. 11. It follows from these statements, according to Watson, that Frazier did not observe the events in this case, and therefore her other testimony about the interactions between Watson and the officers were "clearly based on pure speculation." Pl.'s Br. 11. But Frazier clarified that she meant the police officers spoke with Watson for "about five minutes." Tr. Vol. II, at 367:14–368:4. And to the extent Frazier gave caveats as to her memory or observations, those caveats were for the jury to evaluate. *See* R. 317-1.

Similarly, Watson points out that Moore testified he could not hear the conversation Watson was having with the officers. Pl.'s Br. 12. From this, Watson draws the conclusion that Moore "could not have had personal knowledge" to support his testimony that no one shoved or threatened to body slam Watson. *Id.* But Moore clarified that he was still standing in main area of the AutoZone store when the officers were alleged to have twisted Watson's arm and shoved him out the door. Tr.

17

Vol. II, at 397:15–398:2. To the extent there were any inconsistencies in Moore's testimony, they were, as with Frazier's caveats, for the jury to evaluate.

Second, Watson argues that the Court erred by excluding Moore's deposition testimony about an AutoZone computer printout of Watson's transactions. Watson contends that this testimony showed Moore was mistaken about the timeline of events leading up to the altercation (namely, the date that Watson purchased the car battery at AutoZone). Pl.'s Br. 12. The Court excluded this testimony for insufficient foundation because Moore testified that he had never seen the printout before and was not familiar with it, even though he was generally familiar with the computer system. R. 320-1, at 2; 319-1, at 74–75. That decision was correct. *See* Fed. R. Evid. 602. Not only that, but Watson also fails to explain how excluding that portion of Moore's testimony had any prejudicial effect on the jury. The AutoZone receipt with the date of the battery purchase was admitted into the evidence, and there was no dispute at trial that the battery was purchased on January 10, 2015. *See, e.g.*, Tr. Vol. II, at 384. As with Watson's other challenges, this one likewise fails.

## IV. Conclusion

Watson's motion for a new trial, R. 338, is denied.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 26, 2024